[Criminal No. 880. Filed January 8, 1940.]

[97 Pac. (2d) 927.]

OSCAR TAYLOR, Appellant, v. THE STATE OF ARIZONA, Respondent.

Mr. Marshall W. Haislip, for Appellant.

Mr. Joe Conway, Attorney General, Mr. Albert M. Garcia, Assistant Attorney General, Mr. Richard F. Harless, County Attorney, and Mr. Darrell R. Parker, Assistant County Attorney, for Respondent.

McALISTER, J.—The defendant, Oscar Taylor, was convicted of statutory rape and from the judgment and the order denying his motion for a new trial he appeals.

A number of errors have been assigned but they are discussed under four propositions of law. To understand the assignments properly it is necessary that one have the facts in mind. From the record it appears that appellant was charged with rape alleged to have been committed on March 25, 1938, upon the person of Esther Jackson, a child eleven years of age, then living with her family on 16th Place, which is south of the Southern Pacific tracks and between 16th and 17th Streets in Phoenix. Appellant was then and had been for a number of years an employee of the Southwestern Sash & Door Company in Phoenix and was living at 216 West Osborn Road. He was forty-nine years of age and had a daughter and a grand-

daughter. For seven or eight months before the alleged offense he had been acquainted with the family of Esther Jackson, had visited there frequently and often took with him gifts of groceries and small change which he gave to the Jackson children, of whom there were six. Her mother was ill and some time prior to March 25th had entered a rest home on south 15th Place where she was then resting and later, May 30th, died.

The prosecuting witness testified in substance that early in the afternoon of Sunday, March 20th, appellant visited the Jackson home, gave her $1.12 and suggested that she buy a pair of slacks for her birthday which was the next day. Her older sister took the money and bought the slacks for her. The following Friday she was released from the Wilson School, which she attended, about 4:00 P. M., when she caught the school bus and rode to 16th and Sherman Streets at which point she left the bus and went home. Upon arriving there her father gave her some money and sent her to a Chinese store at the corner of 16th and Jefferson Streets to buy some food for the evening meal. She walked to the store, purchased her groceries and started home on 16th Street, going south. After walking a short distance appellant who was coming from the south on 16th in his car passed her but before going much further north he turned around, drove south, overtook her, stopped, picked her up and asked her if she wanted to go to the hospital to see her mother, stating that he would bring her right back home so she could cook supper. She replied that she was willing to go if he would hurry and bring her back home, and this he promised to do. After she got into the car appellant drove down 16th Street, passed the hospital or rest home without stopping and went on to the river bottom where he turned off on a side road for some distance and brought his car to a stop.

He then asked her if she would have sexual intercourse with him for fifty cents. She refused and "he started to crabbing," told her it would not hurt and asked her to get in the back seat. She did and after getting there himself he pulled her "pants off and then stuck his thing" into her. She told him it hurt but he did not stop, so she began crying and stated to him that if he did not stop she would tell her daddy, and he stopped. She put on her pants and appellant then drove her back to a point on 16th Street near her home, gave her fifty cents, asked her to say nothing about the incident and let her out of the car.

That evening she cooked supper for the family and some time after dark washed her underclothing, which had become bloody from the treatment of appellant, so that none of the family would see it. She did not report the occurrence until the 13th day of April at which time she was taken into custody and questioned by one of the deputy juvenile probation officers.

Dr. Charles W. Sult testified that he examined the genital organs of the prosecutrix in April, 1938, found the vagina to be enlarged and bearing evidence of irritation and some discharge, and in his opinion she had engaged in sexual intercourse.

Grace Miller testified to a conversation she had with the appellant in front of her home on the evening following the day of the crime. During this conversation appellant told her that he had been out with Esther Jackson the night before and had intercourse with her but that he did not have very good success and wanted to try it again.

The appellant denied categorically that he committed the crime charged and introduced the testimony of a large number of witnesses as to his custom or habit of going home around 4:00 P. M., at the end of each day's work, though none of them testified posi-

tively as to what occurred on the 25th day of March, 1938.

In rebuttal of this testimony, the state placed on the stand four witnesses who testified that they saw the appellant between 2 and 6 o'clock in the afternoon in the southeastern section of Phoenix about the month of March, 1938.

██ One of the four propositions of law is based upon the refusal of a new trial sought upon the ground that the verdict is not supported by the evidence but is contrary to both it and the law. Appellant contends that statutory rape is not sustained by the statement of a young girl whose testimony is inherently improbable and very unreasonable, has been directly contradicted and proved false by convincing evidence and shown to have been given under coercion. If these accusations against the testimony of Esther Jackson were true, clearly it would not support a charge of rape, but if they are not true, and this was wholly for the jury to decide, the verdict is amply supported by the evidence and a new trial was properly denied. The fact that the evidence discloses such horrible acts on the part of appellant does not mean that it is untrue, for it is well known that there are people so abnormal and perverted sexually as to commit such crimes. Appellant denied the testimony of Esther Jackson and introduced evidence to show that it was his custom to return home from work shortly after 4:00 P. M. each day and, hence, that he could not have been in the section of the city where Esther lived on March 25th between 4:00 and 5:00 P. M., but none of his witnesses state positively that he was at home at that hour on that particular day. The only persons present when the act was committed were Esther Jackson and appellant, and the jury believed what the former said, as was its right. The

statement that the evidence was given under coercion is based upon the fact that the deputy probation officer to whom the prosecuting witness first admitted the act was in the court room when the latter gave her testimony but did not herself testify. Just why the presence of this officer at the trial and her failure to take the witness stand could or should be construed as coercion does not appear. This assignment is without merit.

 The second proposition is that the judge should not comment on the weight of the evidence nor should he assume as proved facts on which there is conflicting evidence or advise the jury that certain material evidence or a legal theory of the defense is irrelevant and immaterial. These statements are correct as abstract propositions of law but no substantial departure from them is found in the instructions. After informing the jury that the rape charged in this case is known as statutory or constructive rape, and that it is so designated because the element of force which can be proved in the case of ordinary rape has no application where the girl is under the age of consent, the court advised it further that it is the policy of law

"that any female under the age of 18 years is in law incapable of consenting to an act of sexual intercourse, and anyone having sexual intercourse with her, she not being then and there his wife, is guilty of the crime of rape, notwithstanding the fact that he may have obtained her actual consent, because it is immaterial in this case whether the girl in fact consented or not."

By this instruction the appellant claims that the court directed the jury to disregard his theory of defense in that it told that body that the element of force has no application and that it is immaterial whether she does or does not consent when the girl is under the

age of consent. This instruction correctly states the law, for the crime of statutory rape, as distinguished from ordinary rape, is committed when a girl under the age of eighteen years not the wife of the perpetrator has sexual intercourse with a man, and it is wholly immaterial whether she consents or does not consent or whether the act is accomplished with or without force. Appellant does not deny this but contends that the testimony of the prosecuting witness indicates that the act was accomplished without her consent and, this being true, that the jury had a right to consider the fact that she told no one for three weeks as bearing upon the credibility of her testimony as to the manner in which appellant committed the act and consequently weakens her statement that he committed it at all, since the making of seasonable complaint would corroborate or tend to support her testimony that it was accomplished without her consent, while the failure to complain might lead one to regard it differently. The purpose of the instruction was to make it clear to the jury that neither force nor lack of consent was a necessary element of statutory rape, and we are unable to see wherein the instruction to this effect interfered with appellant's right to argue to the jury the effect of her failure to complain or of the jury's right to consider it in determining the weight to be given her testimony. In fact appellant's counsel stressed her failure in this respect in his argument to the jury.

And besides, it is not entirely clear from the testimony of the prosecutrix that the act was wholly without her consent, though the evidence is such that one is more or less led to this view. If, however, appellant felt this to be the effect of her statements and that it rendered the rule he contends for applicable, he should have requested an instruction embodying it, otherwise he cannot complain.

■ Appellant contends further that the court commented on the evidence and assumed appellant guilty of rape by this instruction:

"The material allegation of this information is, as I have just stated, an act of sexual intercourse with a female person under the age of 18 years, not then and there being the wife of the perpetrator, that is not the wife of the defendant Oscar Taylor." ·

It is argued that by the use of the word "perpetrator" in this manner the court in effect told the jury appellant committed the act charged against him. The instruction is not, in our judgment, subject to this construction. Its purpose was merely to advise the jury as to the material allegation of the information and in doing this the court employed almost the identical language the statute itself uses to define the crime of rape. Section 4596, Revised Code of 1928, reads as follows:

"Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under any of the following circumstances: Where the female is under the age of eighteen years;" etc.

■ The third proposition is based upon the following questions put to appellant and two young girls by the county attorney and their answers: (1) In reply to the question, "How frequently did you see Oscar Taylor between the time you first met him and March, 1938?" Grace Miller stated, "Not very often"; (2) appellant testified that he had known Grace Miller about two or two and a half years and in reply to the question, "And it is a fact, is it not, that you have taken Grace Miller out in your car a good many times?" he said, "It is not"; (3) Lola Ames testified that she saw appellant at Grace's home one afternoon in March, 1938, between 4:00 and 4:30 P. M., and when asked,

"State the circumstances of your seeing this man, just what you saw," she replied, "Well, I was there at the house. We had the radio on and we was cleaning house and dancing too, and he drove by and we went out to the car and there was Mr. Taylor and another man, but I don't remember what the man's name was and they stayed there about ten minutes and wanted us to go with them and we would not go."

Appellant's contention is that since the prosecution was for statutory rape the county attorney was guilty of misconduct in introducing evidence insinuating appellant might have been guilty of similar offenses with other girls under the age of consent and that the admonition of the court to the jury to disregard such conduct did not cure the error, for the reason that merely to ask a question carrying such an implication suggests to the jury that the county attorney had information that appellant had been guilty of such conduct or he would not have propounded it. To support this position appellant cites *Walker* v. *State,* 23 Ariz. 59, 201 Pac. 398, in which this court did reverse a conviction for rape because of the misconduct of the county attorney in knowingly and intentionally asking questions so extremely prejudicial that the defendant could not have had a fair trial. And while the questions and answers objected to here are not so highly improper as those were, the trial court thought the second and third were not free from the charge of insinuating similar offenses and that the second especially was intended to impress the jury with the fact that the appellant had been guilty of such conduct with other girls than the prosecuting witness and not, as contended by the state, to show how well acquainted he was with Grace for the purpose of aiding the jury in determining the probable truth of her testimony relative to her conversation with him concerning Esther Jackson, which he had denied. Hence, it was

stricken and the jury admonished to disregard it but the county attorney was permitted to cross-examine the appellant as to the conversation. The answer of Lola Ames to the question relating to the circumstances of her seeing appellant, except the last line, reading, ''they wanted us to go with them and we would not go,'' was proper as rebutting the evidence introduced by appellant to establish an alibi, but because of this objectionable language the court struck the entire answer and directed the jury to disregard it.

██ It appears further that in his closing address to the jury the prosecuting attorney used the following language:

''This man does not act normally and so when you have him dealing with these small children and their confidences and their infant minds, you have a man who is out of the ordinary, who . . . would take little children out and defile their lives, so they would never live normally thereafter. . . . We hewed to the line of the evidence in the State's case, but he can open up the case, but he was afraid to cross examine those three girls further. They might have said something.''

The language ''dealing with these small children, etc.'' might perhaps be subject to more than one meaning, but the statement that he was afraid to cross-examine these three girls further because they might have said something, could hardly, even though it may not have been so intended, have been understood by the jury otherwise than that they could have testified to similar offenses. After the court had ruled several times throughout the trial that testimony of offenses with other girls was not admissible, it was the duty of the prosecuting officer in addressing the jury to observe this ruling scrupulously and not use language susceptible of a different interpretation. Even if that officer was strongly of the view that the court was in error in his ruling and was in fact correct in his ap-

praisal of the court's action, still he could not in his address do otherwise than accept it as the law of the case, since under our system of trial procedure the judge determines the law and, whether correct or incorrect, any ruling made by him during the trial must be followed. It is true we have just decided in *Taylor* v. *State, ante,* p. 13, 97 Pac. (2d) 543, that the similar offense rule applies in both statutory and forcible rape, the same as in other cases, if the evidence of other offenses tends to show a system, plan or scheme and thus helps to establish the offense charged, but in this case no effort was made to invoke that rule. In the questions the court felt tended to show similar offenses, it was claimed that they were asked for a different purpose.

It may be that the questions and answers insinuating other offenses, or the language of the closing address referring to that subject, when considered either alone or together, are not sufficiently prejudicial to call for a reversal, but when there is added to them the fact that a number of listeners in the court room applauded the county attorney's closing address and by so doing told the jury in effect that in their opinions appellant was guilty and should be convicted, it can hardly be said appellant had a fair trial. It is difficult to conceive of conduct by those in the audience that would be more highly prejudicial. The procedure by which the guilt or innocence of one accused of crime is determined is intended to guarantee every person prosecuted for crime, no matter how serious, a fair and impartial trial, and to be sure that this end is attained only those facts that are proper and relevant in the case are permitted to go to the jury. In serious cases the jury is kept together under the care of an officer and no juror is permitted to talk to anyone about the case and is denied the privilege of reading newspapers containing accounts of the proceedings of

the trial. These precautions would be frequently de-
feated, however, if those in the court room may by ap-
plause show their approval of an appeal by the at-
torney for the state or by one for the defense, because
it is plain that under such circumstances the jury is
given some idea of how a part of the public regards
the case and may be unconsciously influenced by it.
The court's instruction to disregard it did not, under
the circumstances, we feel, remove the error.

█ It is contended further that the county attor-
ney was guilty of gross misconduct in his closing argu-
ment in this: he approached appellant sitting at the
table and threatened as if to administer to him cor-
poral punishment and applied to him at different
stages of the address language wholly uncalled for by
the evidence and extremely prejudicial. He referred
to him as a ''sex crazed man'' and to his act as that
''of a warped mind, a sex crazed mind.'' A reading
of the entire argument discloses that the county attor-
ney did make a rather impassioned appeal for the
conviction of appellant, but neither in the language
quoted nor the remainder of the address did he go
further in this respect than the State's evidence war-
ranted. If true, and the jury believed it, the language
applied to appellant was a perfectly normal inference
to be drawn from it.

█ There had been insinuations during the trial
that the juvenile probation office had caused the prose-
cuting witness to involve appellant and in commenting
on this the county attorney said:

''It makes me mad to think that he (appellant's coun-
sel) would say that that girl, that lady, Miss Riffle,
would try to frame a case of this kind and he sits there
by a man who is so guilty, in his eye, so guilty. That
is the reason I get mad about this thing.''

It is urged that in the remark, ''who is so guilty, in
his eye, so guilty,'' the county attorney called atten-

tion to his appearance as an evidence of guilt and that under *Perez* v. *Territory,* 12 Ariz. 16, 94 Pac. 1097, 1098, this constituted error calling for reversal. In the Perez case the defendant had not offered himself as a witness and had not, therefore, the court said, placed his face and countenance in evidence, and besides the language used in that case was so abusive that it is not a guide in this. The district attorney said:

" 'I want to call your attention to the faces and countenances of these defendants. Crime is stamped on their faces and countenances. Their faces and countenances indicate that they are just the kind of people that commit crime. Their hard criminal faces and countenances are conclusive evidence of their guilt, and the only evidence of their guilt you need to convict them. Now, I want you to look at that face (pointing at defendant Perez) and see if it is not the kind of a face that would commit a crime like this.' "

In this case appellant testified at length and his demeanor while doing so was a proper subject of comment.

To avoid any unnecessary and unpleasant publicity the true names of the girls involved in the case have not been used.

The judgment is reversed and the case remanded for a new trial.

ROSS, C. J., and LOCKWOOD, J., concur.